HADLOCK, P. J., dissenting.
*721 After reviewing the record in the light most favorable to the juvenile court's disposition, I conclude that the evidence presented in this case adequately supports the court's exercise of dependency jurisdiction. The majority's contrary conclusion results at least in part from (1) assessing the merits of the juvenile court's expressed on-the-record reasoning, rather than reviewing the court's ultimate conclusion under the pertinent standards of review (see, e.g. , 292 Or. App. at 713-15, 716 n. 4, 425 P.3d at 779-80, 781 n.4), and (2) not considering the risks presented by the totality of the child's condition and circumstances. I respectfully dissent.
Before explaining why I reach a different conclusion than the majority, I pause to observe that the majority and I agree on at least two critically important points. First, as the majority states, "dependency proceedings are not punitive in nature." 292 Or. App. at 715, 425 P.3d at 780. Second, and relatedly, DHS must identify the threat of harm to the child that DHS contends is posed by the child's condition and circumstances. Otherwise, a dependency case can end up seeming like one designed for passing judgment on the parent for past behaviors or circumstances, instead of a proceeding that is aimed at allowing a court to assess whether the child's condition and circumstances presently put the child at risk. Of course, a comprehensive presentation of evidence about events leading up to the dependency trial will often be necessary to explain the risk; however, the ultimate focus always must be on the *784 current threat of harm. Although the majority and I view aspects of the record and of the parties' arguments differently, I agree wholeheartedly with the majority's observation that the parents (and other parties and the courts) are ill-served if DHS does not both expressly identify the harm that it believes the child is reasonably likely to suffer if the juvenile court does not assert jurisdiction and present *722 evidence demonstrating that the current threat of harm exists. 292 Or. App. at 715-16, 425 P.3d at 780-81.
I turn back to this case. As the majority states, mother appeals from a dependency judgment in which the juvenile court asserted jurisdiction over mother's eight-year-old child on three bases, two of which are pertinent on appeal: first, that mother's mental health problems, if left untreated, interfere with her ability to safely parent the child and, second, that mother "became aware of allegations against the father and failed to protect the child placing the child at risk of harm." On appeal, mother argues that DHS failed to prove that the alleged conditions and circumstances exposed child to a risk of serious loss or injury at the time of the jurisdictional trial.
In my view, proper resolution of this appeal depends on faithful application of the standard of review. In Dept. of Human Services v. N. P. , 257 Or. App. 633, 639, 307 P.3d 444 (2013), we took the opportunity "to state clearly our standard of review * * * of a juvenile court's determination of jurisdiction predicated on ORS 419B.100(1)(c)." We explained that our task on appeal is to determine whether "the record permit[ted] the juvenile court to determine that 'the child's condition or circumstances' gave rise to a current 'threat of serious loss or injury to the child' and that there is a 'reasonable likelihood that the threat will be realized.' " Id. (quoting Dept. of Human Services v. A. F. , 243 Or. App. 379, 386, 259 P.3d 957 (2011) ). Specifically, we review the juvenile court's "disposition" to determine whether "the record was legally sufficient to permit that outcome." Id .[1] In doing so, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition." Id . We are bound by the juvenile court's explicit and necessarily implied findings of historical fact as long as any evidence supports them. Id . at 639-40, 307 P.3d 444. Importantly, we do not "substitute our assessment of *723 the persuasiveness of the evidence for the juvenile court's." Id. at 640, 307 P.3d 444.
As those standards from N.P. indicate, our primary task is not to assess the merits of the juvenile court's expressed reasoning. Rather, we must "assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the court implicitly resolved the issue consistently with that disposition." Id. at 639-40, 307 P.3d 444. It follows that our task is to determine whether the record supports the juvenile court's disposition, not whether we find the court's explanation for that disposition persuasive.
No law requires a juvenile court to make detailed on-the-record factual findings to support its exercise of dependency jurisdiction (the "disposition," in N. P. terms).[2]
*785 Moreover, a juvenile court may reasonably decide that, at least in some cases, there are good reasons (including empathy for individuals in the courtroom) not to comprehensively describe all the considerations that led the court to determine that the child's condition and circumstances present a current risk of serious harm. Thus, if the juvenile court gives no explanation for its decision to assert dependency jurisdiction on specified bases, we view the record "in the light most favorable to [that] court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome," id. at 639, 307 P.3d 444, and we do precisely the same when the juvenile court expresses a rationale for its exercise of jurisdiction, whether the court's explanation is *724 comprehensive or can be only partly gleaned from comments it makes on the record. Our focus must remain on the court's ruling , and whether the record supports it, not on whether the court's in-the-moment explanation for its decision itself demonstrates that the legal standards for dependency jurisdiction have been met.[3]
Accordingly, I set out the facts in the light most favorable to the juvenile court's exercise of jurisdiction, not limiting myself to those facts that the juvenile court discussed when it announced its ruling and not focusing on that court's expressed rationale for its decision. I describe the facts in some detail because the majority opinion downplays certain evidence (such as some of mother's trial testimony about her current mental-health status and the evidence of domestic violence in her home) that I believe must be considered when undertaking to view the record in the light most favoring the juvenile court's disposition.
At the time of the trial, mother was 27 years old and lived separately from father. Father had sole custody of child as a result of what mother described as her life falling apart. Under a custody agreement in place before DHS became involved, mother had parenting time two days each week, and child divided the rest of her week between father and father's parents. In very early February 2017, child told mother about "some stuff happening at her dad's house," which involved allegations of sexual abuse. Mother was shocked; she later testified that her "whole body just *725 stopped," she "didn't know how to process it," and she "didn't know what to do." Mother did not call the police or DHS. Nor did mother seek an attorney's assistance, even though she had retained lawyers on multiple other occasions, including in association with custody and child-support issues. She did not seek modification of the custody arrangement. Instead, mother encouraged child, who was then seven years old, to talk to child's teacher (mother knew that teachers are mandatory reporters).
Despite child's disclosure, mother returned child to father's care under the terms of their custody agreement. The week after child's initial disclosure, mother asked child if she had talked with her teacher; child said she had not. Mother still did not contact the teacher herself, report the abuse to anybody else, or file for custody. For about three weeks after her disclosure to mother, child had ongoing contact with father. At some *786 point during that time, mother videotaped child talking about the abuse.
Later in February, DHS received a call about allegations of sexual abuse involving father. The record does not reveal who made that call. On February 22, DHS caseworker Roeder contacted mother and informed her about the allegations. Roeder next saw mother on March 2 at a hospital, where she had been admitted after attempting suicide. Two days later, mother told Roeder that she had consumed "too much alcohol and had taken too much Benadryl as a means of coping with all the information that she had recently been given." She "basically indicated that everything that was going on regarding the child welfare and criminal investigation pertaining to the father was too much for her to handle." Mother disclosed her own history of childhood sexual abuse and said "that was something that made it very difficult for her to know how to effectively process." Based on that conversation, Roeder understood that mother had not effectively engaged in any mental-health services.
During the March 4 conversation, mother acknowledged that child had told her at the beginning of February about "some stuff happening at her dad's house." Roeder decided at that point to remove child from mother's home because she did not "have confidence in mom's mental health *726 and her ability to process all of this and deal with this in an effective way around [child.]" DHS placed child with her maternal grandmother. In late March or early April, the family's case transferred to DHS caseworker Fessler. Mother began engaging in substance-abuse and mental-health services in April and was engaging well in those services at the time of trial. Indeed, mother successfully completed a 90-day "UA [urinalysis] hotline" program and testified that she had stopped drinking.
DHS remained concerned about mother's mental health, however, particularly in light of events that occurred in late June and July. On June 30, grandmother sent text messages to mother that mother perceived "being malicious to [mother]" and not letting her take a breath. In responsive messages, mother made statements about having been crying all day, how being alive is all that matters, and how child "would be even sadder if I'm dead, so please stop." Mother also sent a message saying, "I don't ever want to be awake right now," although she testified at trial that "ever" was meant to be "even" in that text message, and she was indicating only that she wanted to go back to bed. During a team meeting held on July 17-two weeks before the jurisdictional trial-mother denied that those text messages included threats of self-harm, but "she made it very clear that [she was] really struggling" and that it was "really difficult for her to maintain her mental health."
At the August 2 jurisdictional trial, Fessler testified that DHS's original concerns had centered around mother's failure to protectively intervene when child disclosed sexual abuse, as well as mother's suicide attempt. Fessler testified that she was not prepared to return child to mother's home "today," in part because of "concerns about the home environment and how it could affect [mother's] mental health." In particular, Fessler was concerned that child's continuing disclosures about the abuse she had suffered would be "very triggering for [mother's] own mental health" and that mother would not process that appropriately. Mother needed therapy so she could "continue processing why she failed to intervene on her child's behalf," with the hope that "she wouldn't fail to intervene to protect her child in the future."
*727 Relatedly, DHS had developed "very recent" concerns about domestic violence in mother's home "that [prevented the agency] from really utilizing that as a return plan at this time." Fessler was concerned that the domestic violence involving mother's boyfriend, with whom she continued to live at the time of trial, "would create an unsafe situation for [child]." Fessler spoke with mother "multiple times about domestic violence, and [mother] has always denied them." But when Fessler pressed mother on "specifics of domestic violence, like did he ever break property in the home? Did he ever push you? Did he-you know, very specific things that are violent, [mother] will say, yes, that those things did occur." Fessler was concerned that mother "doesn't recognize that violence in that unsafe situation." That *787 is, mother "fails to recognize that it [domestic violence] even exists." Fessler believed that child would be exposed to domestic violence and that mother would not recognize the associated safety risks to child. She also questioned whether mother "could intervene appropriately on her daughter's behalf." Although Fessler had asked mother "not to have her boyfriend around her child, he was."
Mother testified at trial and explained that she now understands that she should have reported the sexual abuse herself "and not put it on" child, although she thought she was doing the right thing at that time. Mother does not know why she did not realize at the time that telling child to report the abuse to her teacher was not the right thing to do. Mother testified that she understands that she can call 9-1-1 to report a crime and that sex abuse is a crime. She said that she would now reach out for help if a situation arose and she did not know what else to do. With respect to the domestic violence involving the boyfriend with whom she lives, mother testified that the statements she made previously about her boyfriend's violence in the home related to situations months earlier, when she had still been drinking and would initiate fights.
When asked if she was still in the process of working on her mental health, mother responded, "No. I'm good." She acknowledged being sad because child is not at home but denied being depressed or having feelings of hurting or *728 killing herself. Mother also said that her mental health had been good on June 30, when she engaged in the concerning series of text messages with grandmother. Mother testified that, because of "therapy and the medication," which she planned to continue, she did not have any mental health issues at the time of trial.[4]
DHS made a brief closing statement, in which it argued that, as long as mother's mental health problems remained unresolved, "failure to take protective actions, remains a safety threat."[5] Mother, in turn, emphasized her cooperation with DHS and engagement in mental-health services. Through counsel, she argued that she "has been pretty open about her struggles" and has found treatment helpful. Mother asserted that her mental-health issues did not present a nonspeculative risk of harm to child, as long as mother continues to do what she has been doing. Finally, mother argued that the allegation regarding her failure to protect child from father no longer presents a risk because a no-contact order was in place that prevented father from contacting child in a way "that mom would need to act in a protective manner."
The juvenile court found child to be within its jurisdiction based on its determination that mother's mental-health problems were complicated, had not yet been resolved in the few months that mother had been involved in services, and left mother at risk of failing to protect her child:
*729 "The ongoing situation is the mental health problems that are deep seated and you know they are, we've talked about it, the complexity, need to be peeled back a little better, or really gotten a better hold of. And that interferes with your ability to safely parent.
*788 "Those mental health issues Ms. Fessler brought up were part and parcel of mom's failure to protect. And they are capable of being repeated, I believe, in relatively short order."
The court therefore entered a judgment finding child within its jurisdiction based on the allegations related to mother's mental health and her failure to protect child from father.
On appeal, as I explain above, this court's task is to determine whether the record-viewed in the light most favoring jurisdiction-permitted "the juvenile court to determine that 'the child's condition or circumstances' gave rise to a current 'threat of serious loss or injury to the child' and that there is a 'reasonable likelihood that the threat will be realized.' " N. P. , 257 Or. App. at 639, 307 P.3d 444. Applying that standard-and taking into account all of the evidence admitted at trial-I would conclude that the record is legally sufficient to support the juvenile court's assertion of jurisdiction.
Mother's mental health struggles are significant and she acknowledges on appeal that those problems led to her failure to protect child when child disclosed having been sexually abused. The record amply supports a finding that mother's difficulties persisted at the time of trial. Mother's response to DHS becoming involved with the family was to attempt suicide. Nearly four months later, despite having begun engagement with mental health services, mother sent text messages to grandmother that the juvenile court reasonably could interpret as conveying thoughts of self-harm. Two weeks before trial, mother still struggled to maintain her mental health. Nonetheless, in her testimony-as contrasted with her legal arguments-mother denied that she had any ongoing mental health issues, essentially asserting that she was "good" and would remain so as long as she remained in therapy and took her medication. The juvenile court could infer from that evidence that mother's mental *730 health struggles continued in ways that mother did not appreciate.
More significantly for purposes of this appeal, the juvenile court also could find that mother had not yet gained the kind of insight or tools that would prompt her-notwithstanding her mental health challenges-to affirmatively intervene to protect child from danger. At trial, mother could not explain why she had thought that the best way to respond to her young child's report of being sexually abused by her father was to tell that child to report the abuse to a teacher. Although she said that she would call 9-1-1 in the future, she could not explain why she did not think to do that when child disclosed abuse; nor did she explain why she had not thought to call a lawyer, even though she had called lawyers to seek advice in other situations. Given that lack of insight, the juvenile court could permissibly find that mother had not gained the ability, in the few months preceding trial, to act protectively toward child in the future.
The remaining question is whether DHS met its burden to prove that mother's continuing inability to act protectively presented a threat of serious harm to child at the time of the jurisdictional trial that was reasonably likely to be realized. Given the totality of the circumstances, I would hold that DHS proved its case.
First, it matters that this child was only eight years old at the time of the jurisdictional trial; we may safely assume that any such young child at some point will encounter potentially dangerous situations (or even people) from which the child needs protection. Second, it matters that mother demonstrated an extraordinary inability or unwillingness to protect this child from the terrible harm of being sexually abused by her father. Mother's failure to protect child from that harm was not momentary; it did not exist only when mother did not take immediate action upon hearing child's disclosure of abuse. Rather, mother took no meaningful steps to protect child over the next three weeks, as child continued to spend time in father's home. We do not know how long that dangerous situation might have continued had DHS not learned, somehow, what child had *731 disclosed.[6] Third, the ongoing need for *789 mother to act protectively toward her child is not merely theoretical, based on child's young age. At trial, mother minimized what she previously had told DHS about her boyfriend's violent behavior in the home, and the juvenile court could infer from all of the related evidence that mother did not appreciate the significance of that violence and the dangers it posed.
Given the totality of those circumstances, I would hold that DHS met its burden to prove that the child's condition and circumstances at the time of trial presented a serious risk of harm that was reasonably likely to be realized. True, the record in this case does not include specific information about the nature and frequency of the domestic violence in mother's home. Under ordinary circumstances, the lack of such evidence could be fatal to a dependency petition. See , e.g. , Dept. of Human Services v. S. A. B. O. , 291 Or. App. 88, 417 P.3d 555 (2018) (reversing dependency judgment based on mental health and domestic violence allegations because, among other things, the record included no "evidence of an actual threat of serious loss or injury to the children that is reasonably likely to be realized"). Nonetheless, I would hold that such evidence is unnecessary here given the unusual combination of mother's extraordinary failure to take any meaningful steps in response to child's disclosure that father had sexually abused her, the fact that mother's failure to take action meant that child spent a significant amount of additional time with father without any protection from potential further abuse, what the juvenile court could reasonably view as mother's continuing mental health challenges, and mother's minimization of the domestic violence in her home. At some point, when a parent's mental health problems result in the parent's profound inability to appreciate risks or to act protectively toward a young child in the face of extreme danger, that inability-in itself-presents a *732 sufficient threat to justify an exercise of dependency jurisdiction. In my view, particularly given the evidence of current domestic violence, the record is legally sufficient to support a determination that that point was reached in this case.
I respectfully dissent.

As used in N. P. , the word "disposition" refers generally to the juvenile court's resolution of the case; it does not refer to "disposition" as that term is sometimes used more specifically in the juvenile-dependency context to refer to the child's placement once dependency jurisdiction has been established. See ORS 419B.325(2) (referring to "proper disposition of the ward").

Other provisions of the juvenile code do require the court to make findings. See, e.g. , ORS 419B.340(1), (2) (requiring a juvenile court that has awarded custody to DHS to include in that part of its order certain determinations and "a brief description of what preventive and reunification efforts were made and why further efforts could or could not have prevented or shortened the separation of the family"); ORS 419B.476(2)(d) (requiring the juvenile court, at a permanency hearing, to "[m]ake the findings of fact under ORS 419B.449(3)," which requires findings on a variety of topics); ORS 419C.355 (requiring the juvenile court to "make a specific, detailed, written finding of fact to support" certain determinations about a youth who is being waived into circuit court for prosecution as an adult). Neither ORS 419B.100 nor the part of chapter 419B that sets out the procedure for dependency hearings (ORS 419B.305 -ORS 419B.340 ) includes a similar requirement regarding the juvenile court's determination that a child is within its dependency jurisdiction.

Of course, when a juvenile court does make express findings, its ultimate ruling must be consistent with those findings. See, e.g. , State v. L. P. L. O. , 280 Or. App. 292, 309, 381 P.3d 846 (2016) (when juvenile court made certain factual findings that established dependency jurisdiction as a matter of law, the court erred by dismissing the dependency petition). Thus, when the juvenile court has expressly found that DHS did not prove a certain fact in a dependency case, we would not rely on evidence that could support a finding of that fact to uphold the court's exercise of dependency jurisdiction. Cf. State v. Hart , 222 Or. App. 285, 288, 193 P.3d 42 (2008) ("we cannot affirm a conviction on the ground that a factfinder could have found a particular fact where it is clear that it found that the fact was not established" (emphases in original)).
In this case, the juvenile court made no express findings that are inconsistent with its exercise of jurisdiction or that would limit our consideration of evidence in the record. Nor, in my view, did the juvenile court exclude any evidence (specifically, evidence about domestic violence) or rule that the evidence was admissible for only a limited purpose. Thus, unlike the majority (see 292 Or. App. at 720 n. 5, 425 P.3d at 783 n.5), I view the entire record as pertinent to our decision.

As the majority notes, mother made those statements in the context of describing additional details about her ongoing mental health treatment and her assertion that she planned to continue that treatment indefinitely. 292 Or. App. at 711 n. 2, 425 P.3d at 778 n.2. A reasonable juvenile court could certainly infer from mother's testimony that mother's progress in addressing her mental health issues was sufficient to alleviate the risk to her child. In my view, however, a reasonable juvenile court could also draw the opposite inference, as I discuss later in this dissent.

Contrary to the majority's accusation, I do not deem DHS's argument to the juvenile court or the bases on which the court asserted jurisdiction to be "largely irrelevant." 292 Or. App. at 720, 425 P.3d at 783. DHS argued below, albeit extremely briefly, that (1) the alleged bases for jurisdiction-mother's mental health problems and her failure to protect child from father-were related, and (2) as long as mother's mental health problems were unresolved, mother's "failure to take protective actions, remains a safety threat." Considered in the context of the evidence that had been presented, those arguments were enough to suggest that the juvenile court should take jurisdiction based on a determination that mother's unresolved mental health challenges prevented her from taking protective steps necessary to maintain child's safety.

As the majority accurately notes, 292 Or. App. at 710 n. 1, 425 P.3d at 777 n.1, the record does not reveal the nature of child's disclosure, other than it related to sexual abuse. However, the record does include references to the resulting criminal charges against father and the fact that an order had issued that prohibited father from having contact with child. Mother has never contended that she disbelieved child (or had reason to), that whatever child disclosed did not seem particularly serious, or that her failure to take immediate steps to protect child was somehow justified.